# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Performance Marketing Ass'n v. Hamer*, 2013 IL 114496

---

| | |
|---|---|
| Caption in Supreme Court: | PERFORMANCE MARKETING ASSOCIATION, INC., Appellee, v. BRIAN HAMER, Director of Revenue, Appellant. |
| Docket No. | 114496 |
| Filed | October 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The federal Internet Tax Freedom Act, which prohibits discriminatory taxes on electronic commerce, preempts Illinois' statutory attempt to require retailers from other states to collect and remit sales or use taxes to Illinois if they utilize click-through performance marketing arrangements to generate over $10,000 per year in internet sales to Illinois customers—commerce clause not reached. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, the Hon. Robert Lopez Cepero, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Brian F. Barov, Assistant Attorney General, of Chicago, of counsel), for appellant.

Ronald L. Wisniewski, of Chicago, and George S. Isaacson and Matthew P. Schaefer, of Brann & Isaacson, of Lewiston, Maine, for appellee.

Brian D. Day and Roger Huebner, of Springfield, for *amicus curiae* Illinois Municipal League.

Tanya P. Triche, of Chicago, for *amicus curiae* Illinois Retail Merchants Association.

Shirley Sicilian, Bruce Fort and Roxanne Bland, of Washington, D.C., for *amicus curiae* Multistate Tax Commission.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, and Theis concurred in the judgment and opinion.

Justice Karmeier dissented, with opinion.

## OPINION

¶ 1    The plaintiff, Performance Marketing Association, Inc., filed a complaint seeking declaratory and injunctive relief against the defendant, Brian Hamer, in his capacity as Director of the Illinois Department of Revenue. Plaintiff alleged that portions of Public Act 96-1544, a so-called "click-through" nexus law, were preempted by federal law and violated the commerce clause of the United States Constitution. The circuit court of Cook County agreed with both propositions and entered summary judgment in plaintiff's favor. Defendant appealed directly to this court. Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011). Because we agree with the circuit court's conclusion that the relevant portions of Public Act 96-1544 are preempted by federal law, we affirm the judgment of the circuit court.

¶ 2                                    Background

¶ 3    Sales tax in the State of Illinois is comprised of two complementary taxes, the Retailers' Occupation Tax Act (35 ILCS 120/1 *et seq.* (West 2010)), which is the principal means for taxing the retail sale of tangible personal property in Illinois, and use tax. Use tax is imposed

"upon the privilege of using in this State tangible personal property purchased at retail from a retailer." 35 ILCS 105/3 (West 2010). The purpose of the use tax is "primarily to prevent avoidance of the [retailers' occupation] tax by people making out-of-State purchases, and to protect Illinois merchants against such diversion of business to retailers outside Illinois." *Klein Town Builders, Inc. v. Department of Revenue*, 36 Ill. 2d 301, 303 (1966). The Retailers' Occupation Tax and the use tax are imposed at the same rate. 35 ILCS 105/3-10 (West 2010); 35 ILCS 120/2-10 (West 2010).

¶ 4        The ultimate responsibility for paying the use tax falls upon the consumer. However, because it is impractical to collect the tax from individual purchasers, the burden of its collection is imposed upon the out-of-state retailer. *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 418 (1996) (citing *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 555 (1977)). In Illinois, any retailer "maintaining a place of business in this State" is required by statute to collect use tax from its customers and remit it to the Illinois Department of Revenue. 35 ILCS 105/2, 3-45 (West 2010).

¶ 5        In 2011, the Illinois General Assembly enacted Public Act 96-1544 (eff. Mar. 10, 2011) (hereinafter, Act). In relevant part, the Act amended the definition of a retailer or serviceman "maintaining a place of business in this state" in Illinois' Use Tax and Service Use Tax Acts. Under these new definitions, a retailer "maintaining a place of business in this state" now includes:

> "a retailer having a contract with a person located in this State under which the person, for a commission or other consideration based upon the sale of tangible personal property by the retailer, directly or indirectly refers potential customers to the retailer by a link of the person's Internet website." Pub. Act 96-1544, § 5 (eff. Mar. 10, 2011) (codified at 35 ILCS 105/2(1.1) (West 2010)).

¶ 6        A serviceman "maintaining a place of business in this state" now includes any serviceman:

> "having a contract with a person located in this State under which the person, for a commission or other consideration based on the sale of service by the serviceman, directly or indirectly refers potential customers to the serviceman by a link on the person's Internet website." Pub. Act 96-1544, § 10 (eff. Mar. 10, 2011) (codified at 35 ILCS 110/2(1.1) (West 2010)).

¶ 7        Thus, pursuant to the Act, out-of-state internet retailers and servicemen are required to collect state use tax if they have a contract with a person in Illinois who displays a link on his or her website that connects an Internet user to that remote retailer or serviceman's website. There is no requirement under the Act that sales be made to Illinois residents to subject the out-of-state retailer or serviceman to Illinois use tax obligations, and there is no requirement that the computer server hosting the Illinois affiliate's website be located in Illinois. Both new definitions are limited, however, to referral contracts that generate over $10,000 per year. Pub. Act 96-1544, §§ 5, 10 (eff. Mar. 10, 2011) (codified at 35 ILCS 105/2(1.1) (West 2010), 35 ILCS 110/2(1.1) (West 2010)).

¶ 8        The type of contractual relationship taxed by the new definitions in the Act is known as "performance marketing." Performance marketing refers to marketing or advertising

programs in which a person or organization which publishes or displays an advertisement (often referred to as an "affiliate" or "publisher") is paid by the retailer when a specific action, such as a sale, is completed. In performance marketing, the retailer tracks the success or "performance" of the marketing campaign, and sets the affiliate's compensation accordingly. Such contractual arrangements are not limited to the Internet. They are also used in print and broadcast media, where promotional codes are used to generate and track sales.

¶ 9       After the Act was enacted, plaintiff, a trade group which represents businesses engaged in performance marketing, filed a complaint against defendant in the circuit court of Cook County. In count I of its complaint, plaintiff alleged that the new definitions in the Act were unconstitutional under the commerce clause of the United States Constitution (U.S. Const., art. I, § 8), because they authorized the collection of use tax with respect to an activity that lacked a substantial nexus with the state of Illinois (see *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992)). In count III of its complaint, plaintiff alleged that the provisions of the Act were expressly preempted by the Internet Tax Freedom Act (ITFA) (47 U.S.C. § 151 note (2000)), which prohibits "discriminatory taxes on electronic commerce." Plaintiff and defendant filed cross-motions for summary judgment.

¶ 10      Following a hearing, the circuit court held that the relevant provisions of the Act failed the substantial nexus requirement for state taxes under the commerce clause and were therefore unconstitutional. The court also concluded that the provisions were expressly preempted under the ITFA. The court therefore entered summary judgment in plaintiff's favor on counts I and III of its complaint, and denied defendant's motion for summary judgment. This appeal followed.

¶ 11                                    Analysis

¶ 12      Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). The interpretation of a statute is a matter of law and is thus appropriate for summary judgment. *Village of Chatham, Illinois v. County of Sangamon, Illinois*, 216 Ill. 2d 402, 433 (2005). We apply a *de novo* standard of review to issues of statutory interpretation and summary judgment rulings. *First American Bank Corp. v. Henry*, 239 Ill. 2d 511, 515 (2011).

¶ 13      Plaintiff alleges both that the relevant provisions of the Act are preempted by federal legislation and that they violate the commerce clause of the United States Constitution. We begin with preemption.

¶ 14      Article VI of the federal constitution provides that the laws of the United States "shall be the supreme Law of the Land; *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Under the supremacy clause, a federal statute will preempt state law in any one of three circumstances: "(1) express preemption—where Congress has expressly preempted state action; (2) implied field preemption—where Congress has implemented a comprehensive regulatory scheme in an area, thus removing the entire field from the state realm; or (3) implied conflict

preemption—where state action actually conflicts with federal law." *Carter v. SSC Odin Operating Co.*, 237 Ill. 2d 30, 39-40 (2010). State law is null and void if it conflicts with federal law. *Sprietsma v. Mercury Marine*, 197 Ill. 2d 112, 117 (2001).

¶ 15    Plaintiff argues that the relevant provisions of the Act are expressly preempted under section 1101(a)(2) of the ITFA (47 U.S.C. § 151 note). That section prohibits a state from imposing "discriminatory taxes on electronic commerce." Section 1105(2)(A)(iii) of the ITFA defines a discriminatory tax, in part, as:

> "(A) any tax imposed by a State or political subdivision thereof on electronic commerce that—
>
> * * *
>
> (iii) imposes an obligation to collect or pay tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means." 47 U.S.C. § 151 note.

The term "tax" in turn is defined in sections 1105(8)(A)(i) and (ii) of the ITFA to include both revenue-raising measures and "the imposition on a seller of an obligation to collect and to remit to a governmental entity any sales or use tax imposed on a buyer by a governmental entity." "Electronic commerce" is defined in section 1105(3) as "any transaction conducted over the Internet *** comprising the sale *** of property, goods, [or] services."

¶ 16    Plaintiff argues that, under the plain language of the ITFA, the relevant provisions of the Act constitute a prohibited, discriminatory tax on electronic commerce. According to plaintiff, the amended definitions of retailer and serviceman "maintaining a place of business in this State" result in the "imposition on a seller of an obligation to collect and remit" use tax, and thus constitute a "tax" within the meaning of the ITFA. Further, the Act's tax-collection obligation is targeted at out-of-state Internet retailers who enter into agreements with Internet affiliates for online performance marketing arrangements and, thus, applies to electronic commerce as defined in the ITFA.

¶ 17    At the same time, however, the Act does not require use tax collection by out-of-state retailers who enter into performance marketing contracts with "offline" Illinois print publishers and over-the-air broadcasters. Plaintiff points to the parties' joint stipulation of facts, which indicates that many out-of-state retailers with no physical presence in the state engage in performance marketing through a variety of media such as catalogs, magazines, newspapers, television and radio, that are accessible by, or distributed to, consumers in Illinois, but are directed at a regional, national and even international audience. Plaintiff asserts that the Act is targeted solely at performance marketing accomplished through "a link on the person's website," with no similar treatment of sales accomplished by other, "offline" means. In plaintiff's view, this is the type of discrimination, directed at electronic commerce, that is expressly prohibited under the ITFA.

¶ 18    Defendant, in response, does not dispute that the Act makes no mention of traditional, "offline" performance marketing contracts. Nevertheless, defendant maintains that the Act is not discriminatory because there are other statutory provisions in Illinois that already impose a use tax collection obligation for "offline" performance marketing. In support, defendant points to paragraph 3 of the definition section of the Use Tax Act. That provision

states that a retailer "maintaining a place of business in this State" includes a

> "retailer, pursuant to a contract with a broadcaster or publisher located in this State, soliciting orders for tangible personal property by means of advertising which is disseminated primarily to consumers located in this State and only secondarily to bordering jurisdictions." 35 ILCS 105/2(3) (West 2010).

According to defendant, this provision covers "offline" performance marketing contracts that are similar to those entered into with Internet affiliates. Thus, in defendant's view, the Act is not discriminatory within the meaning of the ITFA. We disagree.

¶ 19 Under paragraph 3 of the definition section of the Use Tax Act, retailers who enter into contracts with Illinois publishers and broadcasters for advertising "disseminated primarily to consumers located in this State," *i.e.*, locally, are obligated to collect use tax. But Internet advertising is different. As the parties' joint stipulation of facts states: "The home page and other publicly-available pages of any Internet website can be accessed from a computer, or other digital device, located anywhere in the world that is connected to the Internet via wire or radio signal. Thus, information appearing on a webpage is available and *disseminated worldwide*." (Emphasis added.) Illinois law does not presently require out-of-state retailers who enter into performance marketing contracts for "offline" print or broadcast advertising which is disseminated nationally, or internationally, to collect Illinois use tax. However, under the Act, out-of-state retailers who enter into such contracts with Illinois Internet affiliates for the publication of online marketing—which is inherently national or international in scope and disseminated to a national or international audience—are required to collect Illinois use tax. In this way, by singling out retailers with Internet performance marketing arrangements for use tax collection, the Act imposes discriminatory taxes within the meaning of the ITFA.

¶ 20 Defendant also points to section 150.801(c)(2) of title 86 of the Illinois Administrative Code (86 Ill. Adm. Code 150.801(c)(2) (2000)). Under this provision, out-of-state retailers

> "who have any kind of place of business in Illinois or any kind of order-soliciting or order-taking representative either stationed in Illinois or coming into Illinois from time to time, must collect and remit the Use Tax, as such, from Illinois purchasers for use even though the seller is not required to pay Retailers' Occupation Tax when he does nothing in Illinois except to solicit orders." 86 Ill. Adm. Code 150.801(c)(2) (2000).

¶ 21 Defendant does not maintain that an Illinois newspaper or radio station which has a performance marketing contract with an out-of-state retailer would be considered "an order-soliciting or order-taking representative" for purposes of this provision. That is, defendant does not maintain that section 150.801(c)(2) of title 86 applies to advertising. Defendant contends, however, that the Internet links at issue in this case "are not advertising." Instead, according to defendant, "they are active efforts to solicit sales on behalf of out-of-state retailers." Defendant maintains that, because the click-through link is "active" solicitation, it is similar to the activity which is subject to use tax collection under section 150.801(c)(2) of title 86. Thus, according to defendant, the Act is not discriminatory. Again, we disagree.

¶ 22 The parties' joint stipulation of facts states that an Internet affiliate does not receive or

transmit customer orders, process customer payments, deliver purchased products, or provide presale or postsale customer services. Further, an Internet affiliate displaying a link on its website does not know the identity of Internet users who click on the link, and after a user connects to the retailer's website, the affiliate has no further involvement with the user. It is clear, therefore, that there is no interaction between an affiliate and a customer, and no "active" solicitation occurs on the part of the Internet affiliate. The click-through link makes it easier for the customer to reach the out-of-state retailer, but the link is not different in kind from advertising using promotional codes that appear, for example, in Illinois newspapers or Illinois radio broadcasts.

¶ 23    In short, under the Act, performance marketing over the Internet provides the basis for imposing a use tax collection obligation on an out-of-state retailer when a threshold of $10,000 in sales through the clickable link is reached. However, national, or international, performance marketing by an out-of-state retailer which appears in print or on over-the-air broadcasting in Illinois, and which reaches the same dollar threshold, will *not* trigger an Illinois use tax collection obligation. The relevant provisions of the Act therefore impose a discriminatory tax on electronic commerce within the meaning of the ITFA. Accordingly, we affirm the circuit court's judgment that the definition provisions contained in the Act, quoted above and codified at 35 ILCS 105/2(1.1) (West 2010), and 35 ILCS 110/2(1.1) (West 2010), are expressly preempted by the ITFA and are therefore void and unenforceable. Because we hold that the provisions of the Act are void based on preemption, we do not reach plaintiff's alternative argument that the new definitions provisions of the Act violate the commerce clause of the United States Constitution. See *National Commercial Banking Corp. of Australia, Ltd. v. Harris*, 125 Ill. 2d 448, 454-55 (1988).

¶ 24                                     Conclusion

¶ 25    For the foregoing reasons, the judgment of the circuit court granting summary judgment in favor of plaintiff and denying defendant's motion for summary judgment is affirmed.

¶ 26    Affirmed.

¶ 27    JUSTICE KARMEIER, dissenting:

¶ 28    Public Act 96-1544 does not impose any new taxes or increase any existing taxes. Substantive tax liability under Illinois law is unaffected. Sales transactions subject to use and service use taxes are the same now as they were before the Act took effect. What the law does, instead, is simply amend the definition of retailers and servicemen who are obligated to collect and remit Illinois use and service use taxes to the Department of Revenue. It makes this change for reasons that are entirely reasonable and proper: (1) to enhance the collection of revenues already due under Illinois law by reducing the circumstances in which payment of the tax is left to individual purchasers or consumers who may neglect or refuse to remit what they owe to the Department of Revenue, and (2) to ameliorate the competitive disadvantage suffered by existing Illinois retailers and servicemen who must already include use and service use taxes in the amount they charge their customers and then take

responsibility for remitting the tax to the state.

¶ 29    Under controlling case law, we must presume Public Act 96-1544 to be valid. The burden is on Performance Marketing Association, Inc. (PMA), the plaintiff in this case, to overcome that presumption. In my view, it has failed to meet that burden. Contrary to the majority, I would therefore reverse the judgment of the circuit court and remand with directions to enter summary judgment in favor of the Director of the Department of Revenue.

¶ 30    Prior to enactment of Public Act 96-1544, retailers and servicemen who utilized the internet to make retail sales of tangible personal property or services used in Illinois were required to collect and remit use or service use taxes only if they or one of their subsidiaries had an actual office, distribution house, sales house, warehouse or other place of business located within this state or had an agent or other representative operating within this state under their authority or the authority of a subsidiary. If the retailer or serviceman did not have such a presence in Illinois, its retail sales of tangible personal property or services used here were still subject to the tax. The difference is that the obligation to remit the tax shifted to the purchasers, who were required to self report and pay the tax directly to the Department of Revenue. 35 ILCS 105/10 (West 2012); 35 ILCS 110/10 (West 2012).

¶ 31    When the onus is placed on consumers to report and remit tax on their retail purchases, taxable retail sales are underreported. That is so, in part, because such sales are difficult for the state to police, a circumstance which consumers are quick to appreciate. The result is that collection of use and service use taxes suffers, depriving the state of needed revenue to which it is entitled. Moreover, as consumers realize that they can avoid their use tax liability by turning to out-of-state internet retailers with no physical presence here, retailers and servicemen with places of business located within Illinois are placed at a competitive disadvantage because they, unlike their out-of-state internet competitors, must include the tax in the amount they charge and then assume responsibility for remitting that tax money to the State. See Joel Griffiths, Comment, *Use It or Lose It: State Approaches to Increasing Use-Tax Revenue*, 60 U. Kan. L. Rev. 649 (2012); Michael R. Gordon, *Up the Amazon Without a Paddle: Examining Sales Taxes, Entity Isolation, and the "Affiliate Tax"*, 11 N.C. J. L. & Tech. 299 (2010).

¶ 32    This situation is not unique to Illinois. It has been problematic for many states throughout the United States. Three basic strategies have emerged for addressing it: (1) increasing efforts to notify remote sellers and in-state purchasers that the transaction is subject to the use tax; (2) participation by the state in the Streamline Sales Tax Project (SSTP) and adoption of the Streamlined Sales and Use Tax Agreement (SSUTA), a collaborative effort aimed at reducing compliance and administrative burdens related to use taxes; and (3) implementation of what have become known as "affiliate" or "Amazon" tax provisions, the latter appellation derived from the giant online retailer. Griffiths, *supra* at 659-64.

¶ 33    The first "affiliate" or "Amazon" tax law was enacted by New York State in 2008. Under the New York law, an internet retailer is presumed to be a vendor required to collect sales tax on its New York sales if the retailer makes sales of taxable property or services and:

> " 'enters into an agreement with a resident of [New York] under which the resident, for a commission or other consideration, directly or indirectly refers

potential customers, whether by a link on an internet website or otherwise, to the seller, if the cumulative gross receipts from sales by the seller to customers in [New York] who are referred to the seller by all residents with this type of an agreement with the seller is in excess of ten thousand dollars during the preceding four quarterly periods ... .' " Gary C. Bingel & John C. Genz, *High Court Upholds 'Amazon Tax' Provision for Internet Retailers*, 23 J. Multistate Tax'n & Incentives 33 (July 2013).

Similar legislation was subsequently enacted in at least half a dozen other states, including Illinois. Griffiths, *supra* at 659; Jessica Nicole Cory, *The Gap Created by E-Commerce: How States Can Preserve Their Sales and Use Tax Revenue in the Digital Age*, 8 Okla. J. L. & Tech. 57 (2012).

¶ 34 Public Act 96-1544, the legislation being challenged in this case, is the Illinois version of New York State's Amazon Law. The Act amended section 2 of the Use Tax Act (35 ILCS 105/2 (West 2012)) and section 2 of the Service Use Tax Act (35 ILCS 110/2 (West 2012)) to expand the definition of "retailer maintaining a place of business in this State" and "serviceman maintaining a place of business in this State." Basically, the amendment broadened those definitions to include retailers and servicemen who contract with internet affiliates having a physical presence in Illinois to place links on the affiliates' website to solicit customers for their businesses, pay their Illinois internet affiliates a commission based on the sales generated through the links, and make over a certain dollar amount in sales through those links.

¶ 35 PMA, a trade organization representing internet retailers who oppose Public Act 96-1544, brought this action for declaratory and injunctive relief to have the law invalidated on the grounds that it unduly burdens interstate commerce in contravention of the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3). PMA alleged that the statute also violates the commerce clause because it represents an improper attempt by Illinois to regulate commerce outside this state's borders. In addition, PMA challenged the law on the grounds that it imposes a "discriminatory tax" within the meaning of the federal Internet Tax Freedom Act (47 U.S.C. § 151 note) and, under the federal Constitution's supremacy clause (U.S. Const., art. VI, cl. 2), is preempted by the federal statute.

¶ 36 On the parties' cross-motions for summary judgment, the circuit court concluded that Public Act 96-1544 was facially invalid under the commerce clause. It further held that the statute was preempted by the federal Internet Tax Freedom Act and could not be enforced in any case. Although the circuit court reserved for future consideration PMA's request for an award of attorney fees and costs, the court made an express written finding pursuant to Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) that there was no just reason for delaying enforcement or appeal. Because it declared the statute invalid, the circuit court opined that the appeal could be brought directly to our court under Supreme Court Rule 302(a) (Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011)).

¶ 37 Throughout this appeal, the focus of the argument by the parties and by the Multistate Tax Commission and the Illinois Retail Merchants Association and Illinois Municipal League, who were granted leave to file friend of the court briefs in support of the Director of Revenue, has been whether the circuit court erred when it held that Public Act 96-1544

is invalid under the commerce clause. Contrary to the majority's characterization, the commerce clause issue was not merely an "alternative" challenge. *Supra* ¶ 23.

¶ 38     That the parties' arguments centered on the commerce clause is hardly surprising. The limits posed by the commerce clause have been at the center of a nationwide debate regarding the power of states to impose and collect taxes on sales conducted through the internet. See, *e.g.*, Gordon, *Up the Amazon Without a Paddle, supra;* Griffiths, *Use It or Lose It*, *supra*; Rob Owen, *The "Amazon Tax" Issue: Washing Away the Requirement of Physical Presence for Sales Tax Jurisdiction Over Internet Businesses*, 2013 U. Ill. J. L. Tech. & Pol'y 231.

¶ 39     While this appeal was pending, the Court of Appeals of New York, that state's highest court, considered and rejected a commerce clause challenge to New York's version of Public Act 96-1544. *Overstock.com, Inc. v. New York State Department of Taxation & Finance*, 987 N.E.2d 621, 622 (N.Y. 2013). The parties have not cited and I have not discovered any authority from a court of review which has reached a contrary result and held that internet affiliate tax collection requirements of the kind at issue here and in the New York case run afoul of the federal commerce clause. How our court was going to resolve the issue was therefore a matter of considerable interest, concern and significance.

¶ 40     Unfortunately, the majority has elected to ignore the commerce clause issues entirely and decide the case based solely on federal preemption grounds. The decision is a puzzling one for several reasons. First, a determination that a state law is preempted by a federal one is not tantamount to a repeal or invalidation of the state statute. The legislative enactment of the state is merely suspended and rendered unenforceable by the existence of the federal enactment. *Lily Lake Road Defenders v. County of McHenry*, 156 Ill. 2d 1, 8 (1993); *Kinsey Distilling Sales Co. v. Foremost Liquor Stores, Inc.*, 15 Ill. 2d 182, 193 (1958).[1] Because of this, we have made clear that a determination that a statute of this state is preempted by federal law does not constitute "invalidity" for purposes of the rule authorizing direct appeal to our court in cases where a statute of the United States or of this state has been held invalid. Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011).

¶ 41     If preemption were the sole basis for the circuit court's ruling in this case, that ruling would therefore not even be properly before us under Rule 302(a). Rather, we would be

---

[1]The majority cites *Sprietsma v. Mercury Marine*, 197 Ill. 2d 112, 117 (2001), for the proposition that federal preemption renders a conflicting state law "null and void." *Supra* ¶ 14. *Sprietsma* does not say that and it is incorrect as a matter of law. When a state statute conflicts with an act of Congress, the state statute merely "yields" to the federal law (see *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000)), which supercedes it (see, *e.g.*, *Arizona v. United States*, 567 U.S. ___, ___, 132 S. Ct. 2492, 2501 (2012)). To the extent of the conflict, the state law is "without effect" (*Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)) and enforcement is precluded (see *Arizona v. United States*, 567 U.S. at ___, 132 S. Ct. at 2501), but the state law itself remains on the books. I note, moreover, that *Sprietsma* did not even involve a conflict between a state statute and a federal one and, in any case, it was promptly reversed by the United States Supreme Court (*Sprietsma v. Mercury Marine, a Division of Brunswick Corp.*, 537 U.S. 51, 64 (2002)), circumstances the majority fails to mention.

obliged to transfer the appeal to the appellate court. See Ill. S. Ct. R. 365 (eff. Feb. 1, 1994). Under these circumstances, I would think that if we are intent on proceeding with direct review, we should at least give some consideration to the one issue decided by the circuit court which would give us jurisdiction to do so.

¶ 42    I must also point out that Justice Burke, author of the majority's opinion, has frequently taken this court to task for not reaching important legal issues presented by an appeal, even when resolution of those issues is not necessary for disposition of the particular controversy before it. See, *e.g.*, *In re Estate of Boyar*, 2013 IL 113655, ¶¶ 49-51 (Burke, J., dissenting); *In re K.E.F.*, 235 Ill. 2d 530, 541-43 (2009) (Burke, J., dissenting, joined by Freeman, J.); *People v. Evans*, 2013 IL 113471, ¶¶ 22-27 (Burke, J., dissenting); *Cooney v. Rossiter*, 2012 IL 113227, ¶¶ 42-46 (Burke, J., specially concurring, joined by Freeman and Theis, JJ.); *People v. White*, 2011 IL 109689, ¶¶ 156-82 (Burke, J., dissenting, joined by Freeman, J.). In *Boyar*, her most recent pronouncement on the subject, Justice Burke defended her position, in part, on the grounds that deferring resolution of an issue can prove counterproductive in circumstances when the same issue is likely to come before us again. *In re Estate of Boyar*, 2013 IL 113655, ¶ 51 (Burke, J., dissenting).

¶ 43    Such circumstances were not actually present in *Boyar* itself, where the legal issue Justice Burke wanted us to take up was arcane, it had no application to the dispute before us, and there was no empirical basis for believing it was likely to arise again any time soon. Such circumstances *are* present here. Recurrence of the commerce clause issue is highly likely. The Internet Tax Freedom Act (47 U.S.C. § 151 note), the federal law held by the majority to preempt Illinois' Public Act 96-1544, is not a ban but a moratorium. See Title XI of Pub. L. No. 105-277, § 1101(a). It had no effect on liability for taxes accrued and enforced prior to its enactment (*id.* § 1101(c)), and it will expire, by its terms on November 1 of next year. 47 U.S.C. § 151 note (as amended by H.R. Res. 3678, eff. Nov. 1, 2007).

¶ 44    Once the moratorium imposed by the federal law is lifted, Public Act 96-1544 will be revived and reinstated without the need for any express reenactment by the legislature. *Lily Lake Road Defenders v. County of McHenry*, 156 Ill. 2d at 8; *Kinsey Distilling Sales Co. v. Foremost Liquor Stores, Inc.*, 15 Ill. 2d at 193. A new commerce clause challenge is certain to follow. A year from now we could therefore find ourselves in precisely the same position we are in today, facing the same commerce clause challenge brought by and against the very same litigants. The delay will have accomplished nothing.

¶ 45    The issue has been fully briefed and argued and is ripe for a decision now. We should make one. I am prepared to do so. Just as New York's high court did when reviewing its state's internet affiliate tax law, I would hold that the tax-related obligations imposed by Public Act 96-1544 apply to an activity with a substantial nexus to Illinois and that PMA's claim that the law is facially invalid under the commerce clause should therefore have been rejected by the circuit court.[2]

---

[2]State taxation obligations which impact the commerce clause must meet various criteria in addition to the substantial nexus requirement, but here, as in the New York case, the substantial nexus requirement was the basis for plaintiff's challenge to the law.

¶ 46     Failure to address and resolve the commerce clause challenge is not only the reason I cannot join in the majority's opinion. I must also take issue with its conclusion that, under federal preemption principles, Public Act 96-1544 is rendered wholly inoperative by the federal Internet Tax Freedom Act. Although the majority opinion enumerates the various ways in which federal law may operate to preempt a state law, it omits any mention of the standards established by the United States Supreme Court for assessing whether and to what extent there is federal preemption in a particular case. We are bound by those standards. Had the principles articulated by the United States Supreme Court been properly considered and applied here, they would have compelled the conclusion that Public Act 96-1544 has not been preempted.

¶ 47     The United States Constitution created a federal government of limited powers. It is unmistakably clear on this point. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X. Under our constitutional system, the states thus retain substantial sovereign authority. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

¶ 48     Because our federal system recognizes that sovereign power resides in both the state and federal governments, the potential for conflict between state and federal laws is apparent. The Constitution addresses this problem through the supremacy clause (U.S. Const., art. VI, cl. 2), which provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *Arizona v. United States*, 567 U.S. ___, ___, 132 S. Ct. 2492, 2500 (2012).

¶ 49     The supremacy clause has been interpreted by the United States Supreme Court to mean that Congress has the power to preempt state law (*id.* at ___, 132 S. Ct. at 2500) provided, of course, that it is acting within the powers granted to it by the Constitution when it does so (*Gregory v. Ashcroft*, 501 U.S. at 457). However, because of the extraordinary nature of this power and its implications for the critical political balance between the state and federal governments, the United States Supreme Court has cautioned that it is a power we must assume Congress does not exercise lightly. *Id.* at 460.

¶ 50     Consistent with this admonition, the Supreme Court has held that preemption analysis must begin with the presumption that Congress did not intend to supplant state law. *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981); *Scholtens v. Schneider*, 173 Ill. 2d 375, 379 (1996). Where a state statute is claimed to be preempted by an act of Congress, as in the case before us here, the language used in the federal legislation is the best evidence of whether or not Congress intended it to have preemptive effect. *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. ___, ___, 133 S. Ct. 1769, 1778 (2013).

¶ 51     When reviewing the language of the federal law, it is important to bear in mind that inclusion of an express preemption clause or provision does not end the inquiry. Such a provision tells us that Congress intended to supersede or modify state law to some extent, but courts must still deal with the task of determining the substance and scope of Congress' displacement of state law. If the text of a preemption provision is open to more than one plausible reading, courts ordinarily accept the reading that disfavors preemption. *Riegel v.*

*Medtronic, Inc.*, 552 U.S. 312, 334-35 (2008) (Ginsburg, J., dissenting).

¶ 52    Just as there is a presumption against preemption, there is a presumption in favor of the validity of the state law. *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 661 (2003). The burden of overcoming that presumption and establishing that Congress intended to oust the state from the exercise of powers otherwise available to it is on the party claiming that the state law has been preempted. *Id.* at 661-62; *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. Abrams*, 899 F.2d 1315, 1319 (2d Cir. 1990)). The presumption against federal preemption applies with special force where a matter of primary state responsibility, such as local taxation, is at stake. Accordingly, no federal preemption exists concerning a state or local tax unless Congress made its intent to preempt unmistakably clear in the language of the federal statute. *Tri-State Coach Lines, Inc. v. Metropolitan Pier & Exposition Authority*, 315 Ill. App. 3d 179, 194 (2000).

¶ 53    Public Act 96-1544, the legislation being challenged in this case, falls within this standard. It concerns state tax. As explained earlier in this dissent, it amends the Illinois use tax and service use tax statutes to expand the definition of retailers and servicemen obligated to collect and remit use and service use taxes.

¶ 54    When it enacted the federal Internet Tax Freedom Act, Congress did not make it unmistakably clear that it intended to preempt use tax collection measures such as Public Act 96-1544. Contrary to its title, the federal law "does not create 'tax freedom' for transactions on the Internet" (*City of Chicago, Illinois v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010)), and the Act itself does not purport to assert any general federal authority over matters of state and local taxation. To the contrary, when Congress drafted the Internet Tax Freedom Act, it went to pains to make clear that except as provided in section 1101 of the Act,

> "nothing in this [Act] shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or superseding of, any State or local law pertaining to taxation that is otherwise permissible by or under the Constitution of the United States or other Federal law and in effect on the date of enactment of this Act." Interstate Tax Freedom Act, § 1101(b), 47 U.S.C. § 151 note.

¶ 55    The moratorium imposed by the Interstate Tax Freedom Act is addressed to two specific things: (1) "taxes on Internet access," something which has no bearing whatever on the subject matter of Public Act 96-1544, and (2) "multiple or discriminatory taxes on electronic commerce." Interstate Tax Freedom Act, § 1101(a)(1), (2), 47 U.S.C. § 151 note. As defined by the Act, "multiple" tax means two states taxing the same thing without a tax credit. *Id.* § 1105(6), 47 U.S.C. § 151 note; *City of Chicago, Illinois v. StubHub!, Inc.*, 624 F.3d at 366. The expanded definitions implemented by Public Act 96-1544 do not result in that happening, so that is not at issue here either. That leaves only the question of whether the changes introduced by Public Act 96-1544 run afoul of the Internet Tax Freedom Act's temporary ban on "discriminatory taxes."

¶ 56    Because Public Act 96-1544 does not create any new taxes or tax liability, it is not a "tax" in the commonly understood sense. However, in another peculiarity of phrasing, the Internet Tax Freedom Act includes in its definition of "tax" not only actual taxes, but also "the imposition on a seller of an obligation to collect and to remit to a governmental entity

-13-

any sales or use tax imposed on a buyer by a governmental entity." Interstate Tax Freedom Act, § 1105(8)(A)(ii), 47 U.S.C. § 151 note. The statutory amendments promulgated under Public Act 96-1544 do expand the group of sellers obligated to collect and remit Illinois sales and use tax, so they certainly fall within the federal statute's unique conception of a tax. The real dispute is whether and to what extent they are "discriminatory."

¶ 57        To be "discriminatory" within the meaning of the federal law, a tax must fall within one of the following specifically defined categories:

"(A) any tax imposed by a State or political subdivision thereof on electronic commerce that—

(i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;

(ii) is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as part of a phase-out of the tax over not more than a 5-year period;

(iii) imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means;

(iv) establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means; or

(B) any tax imposed by a State or political subdivision thereof, if—

(i) the sole ability to access a site on a remote seller's out-of-State computer server is considered a factor in determining a remote seller's tax collection obligation; or

(ii) a provider of Internet access service or online services is deemed to be the agent of a remote seller for determining tax collection obligations solely as a result of—

(I) the display of a remote seller's information or content on the out-of-State computer server of a provider of Internet access service or online services; or

(II) the processing of orders through the out-of-State computer server of a provider of Internet access service or online services." Interstate Tax Freedom Act, § 1105(2), 47 U.S.C. § 151 note.

¶ 58        In the case before us today, the amendments to the use and service use tax statutes contained in Public Act 96-1544 are not alleged to be "discriminatory" in any of the foregoing ways except one: imposing "an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means." Interstate Tax Freedom Act,

§ 1105(2)(A)(iii), 47 U.S.C. § 151 note. But the amendments at issue here do no such thing. The obligation they impose with respect to collecting and remitting use and service use taxes falls on retailers and servicemen just as it does in all other transactions, electronic or otherwise, where the sales activity of the vendor or service provider has a substantial nexus with Illinois. The law simply refines the definition of retailer and servicemen to reflect the evolving nature of electronic commerce involving our state. Its goal is to insure equal treatment, not impose extra responsibility.

¶ 59    In disputing this point, PMA attempts to find a discriminatory effect in the law by positing a situation where an out-of-state retailer advertises the sale of tangible personal property under a contract with an Illinois publisher or broadcaster and the advertising is directed primarily at a national or even international audience, rather than to Illinois consumer. As PMA reads our use tax law, such a retailer would not be obligated to collect and remit the use tax on any transactions subject to the law, and in PMA's view, that retailer's status is indistinguishable from the status of the out-of-state e-commerce retailers it represents who will be subject to tax collection obligations under Public Act 96-1544. Because the "offline" retailer would not be required to collect and remit the tax, PMA argues that under the Internet Tax Freedom Act, the e-commerce retailers it represents cannot lawfully be required to collect it either.

¶ 60    This contention is untenable. For one thing, the parallel drawn by PMA between the sales activities of the internet vendors it represents and the "offline" merchants in its example is flawed. It is true that most commercial solicitations made via internet websites can be viewed anywhere in the world by anyone with computer access. That is in the nature of how the internet works. But contrary to the position urged by PMA and accepted by the majority (see *supra* ¶ 19), the mere fact that it is technically possible to view an internet ad from anywhere does not make the ad "inherently national or international in scope and disseminated to a national or international audience." One of the great advantages of internet marketing is that it permits narrow targeting of particular customers in particular places with particular interests in a way which print and broadcast media do not. From the record before us, there is no reason to assume that this will not be the predominant way in which Illinois-based internet services will be utilized by the out-of-state retailers and servicemen now covered by Public Act 96-1544. There is no dispute that when an out-of-state retailer avails itself of Illinois print or broadcast media to target Illinois consumers, it is required to collect and remit use tax. 35 ILCS 105/2(2), (3) (West 2012). If an out-of-state retailer uses Illinois internet services to target Illinois consumers in the same way, requiring it to likewise collect and remit use tax is therefore not discriminatory. It is fair.[3]

¶ 61    Second, as the Multistate Tax Commission aptly observes in its friend of the court brief, the particular form of solicitation activity addressed by Public Act 96-1544 has no direct analog outside the context of the internet. Other forms of commercial solicitation may

---

[3]Arguably, it is more than fair. Out-of-state internet retailers are not covered by the law unless they meet a certain sales threshold. Offline retailers are obliged to collect and remit use tax no matter how small their sales are.

employ some form of "performance-based" marketing, but none possesses the immediacy or directness of the "click-through" marketing possible online. As pointed out earlier in this dissent, the Internet Tax Freedom Act does not, in fact, create "tax freedom" for commercial transactions on the internet. It requires only that internet transactions not be treated less favorably than would be the case with non-internet-based transactions. If an internet marketing scheme has no true offline counterpart, it is difficult to see how requiring the retailer to collect and remit the use tax due on the resulting transactions can be deemed discriminatory within the meaning of the federal statute.

¶ 62       Finally, PMA has not adduced a single example of a situation in Illinois or any other jurisdiction with an "affiliate" or "Amazon" tax where a use tax has actually been imposed on an internet retailer in a way that is inconsistent with the language and purposes of the Internet Tax Freedom Act. PMA's concerns over conflicting state law are therefore entirely speculative. That one may be able to hypothesize potential conflicts with federal legislation is not a legally sufficient basis under the supremacy clause for completely jettisoning a state law as the majority has done here. To the contrary, it is well settled that under the supremacy clause of the United States Constitution, a federal law preempts a conflicting state law and the state law is displaced only to the extent it *actually* conflicts with federal law. *Dalton v. Little Rock Family Planning Services*, 516 U.S. 474, 476 (1996); *People ex rel. Director of Corrections v. Booth*, 215 Ill. 2d 416, 425-26 (2005); *In re Marriage of Hulstrom*, 342 Ill. App. 3d 262, 266 (2003). Absent a showing of such an actual conflict, PMA's claims of preemption must therefore be rejected.[4]

¶ 63       In *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 586 (1995), the United States Supreme Court observed that it has "long [been] recognized that principles of federalism and comity generally counsel that courts should adopt a hands-off approach with respect to state tax administration [for '[i]t is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible.' [Citation.]" Rather than heed this admonition, the majority ignores it and, indeed, the entire body of supremacy clause jurisprudence developed by the United States Supreme Court over the past several decades. This it may not do. The supremacy clause itself forbids it. As the Supreme Court of Pennsylvania correctly observed, "[i]t is fundamental that by virtue of the Supremacy Clause, the State courts are bound by the decisions of the Supreme Court with respect to the federal Constitution and federal law, and must adhere to extant Supreme Court jurisprudence. U.S. Const. art. VI, cl. 2; *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 221, 51 S. Ct. 453, 75 L. Ed. 983 (1931)." *Council 13, American Federation of State, County & Municipal Employees ex rel. Fillman v. Rendell*, 986 A.2d 63, 77 (Pa. 2009).

---

[4]I note, parenthetically, that to the extent federal law might preempt the application of portions of Illinois use tax law in certain circumstances, there would be no impediment under Illinois law to enforcement of the remainder of the law or its application to persons or circumstances other than those to which it was held invalid. 35 ILCS 105/18 (West 2012).

¶ 64    Today's decision by the majority marks the first time a court of review in the United States has determined that the Internet Tax Freedom Act preempts a state from enacting an internet affiliate tax law to facilitate the collection of existing use taxes to which the state is legally entitled. Under the standards articulated by the United States Supreme Court and set forth in this dissent, standards by which we are bound, that determination is inconsistent with supremacy clause principles. For this reason, and because Public Act 96-1544 is not invalid under the commerce clause, the judgment of the circuit court in favor of PMA should be reversed and the cause should be remanded with directions to enter summary judgment in favor of the Director of Revenue. I therefore respectfully dissent.