2019 IL App (1st) 181379

FIRST DISTRICT
FOURTH DIVISION
September 30, 2019

No. 1-18-1379

| | | |
|---|---|---|
| | ) | Appeal from the |
| MICHAEL LABELL, JARED LABELL, NATALIE | ) | Circuit Court of |
| BEZEK, EMILY ROSE, BRYANT JACKSON-GREEN, | ) | Cook County |
| ZACK UREVIG, and FORREST JEHLIK, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | No. 15 CH 13399 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| THE CITY OF CHICAGO and ERIN KEANE, in her | ) | Carl Anthony Walker, |
| official capacity as Comptroller of the City of Chicago, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Lampkin and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, the city of Chicago (City), imposes a nine percent amusement tax on charges

paid for the privilege to enter, witness, view, or participate in certain activities within Chicago.

In 2015, the City's comptroller issued Ruling 5, which provided guidance on the collection of the

amusement tax as it pertained to amusements that are delivered electronically.  Electronically

Delivered Amusements Ruling 5 (eff. July 1, 2015) (Ruling 5).  Ruling 5 stated that beginning

July 1, 2015, charges paid for the privilege of watching electronically delivered television shows,

movies, or videos would be subject to the amusement tax if the shows, movies, or videos are

delivered to a patron in the City. Ruling 5 also clarified that the amusement tax would cover the privilege of listening to electronically delivered music and participating in games, online or otherwise, when delivered to a customer in the City. To determine the sourcing for the amusement tax, the City's department of finance indicated it would utilize the rules set forth in the Mobile Telecommunications Sourcing Conformity Act (MTSCA) (35 ILCS 638 (West 2014)), which meant that the amusement tax would apply to customers whose residential street address or primary business address was in Chicago, "as reflected by their credit card billing address, zip code, or other reliable information."

¶ 2      In November 2015, the City council amended the Chicago Municipal Code as it related to the amusement tax to include that in the case of amusements delivered electronically to mobile devices, such as in the case of video streaming, audio streaming, and on-line games, the rules set forth in the MTSCA may be utilized to determine which customers are subject to the tax. Chicago Municipal Code § 4-156-020(G1) (added Nov. 21, 2017).

¶ 3      Plaintiffs, Michael Labell, Jared Labell, Natalie Bezek, Emily Rose, Bryant Jackson-Green, Zach Urevig, and Forrest Jehlik (collectively plaintiffs) brought this suit in the circuit court of Cook County against defendants, the City and Erin Keane in her official capacity as comptroller. In their complaint, plaintiffs challenged the constitutionality of the City's amusement tax as it related to internet-based streaming services (streaming services tax) and sought declaratory and permanent injunctive relief.

¶ 4      Upon consideration of cross-motions for summary judgment, the circuit court upheld the constitutionality of the streaming services tax. On appeal, plaintiffs contend the City's application of the amusement tax on streaming services exceeds the City's constitutional and statutory authority. Specifically, the tax on streaming services (1) exceeds the City's authority to

tax under the Illinois Constitution art. VII, § 6, because the City imposes the tax based on a customer's billing address, not whether the customer is using the amusement within Chicago; (2) violates the uniformity clause of the Illinois Constitution of 1970; and (3) discriminates against electronic commerce in violation of the federal Internet Tax Freedom Act (ITFA) (47 U.S.C. § 151 (note)).  For the reasons that follow, we affirm the judgment of the circuit court.

¶ 5                                                    BACKGROUND

¶ 6      Plaintiffs are residents of Chicago and subscribers to various services that provide media delivered electronically, including Netflix, Hulu, Spotify, and Amazon Prime.  Netflix is a provider of on-demand internet streaming media, which allows subscribers to watch video content online, and of a flat-rate video-by-mail service which allows subscribers to borrow DVD and Blue-ray video discs and return them in prepaid mailers.  Hulu provides similar video-streaming services, but does not offer video-by-mail service.  Spotify is a music streaming service which allows consumers to access a large library of recorded music for a subscription fee.  Amazon Prime is a membership service that provides members with certain benefits provided by Amazon.com, including access to streaming movies, music, cloud storage, and the ability to borrow e-books.

¶ 7      Plaintiffs are mounting a facial challenge to the constitutionality of the amusement tax as it relates to streaming services; accordingly, a brief history of the amusement tax ordinance is warranted.  In 1947 the City enacted an amusement tax ordinance which imposed a tax on organizers, sponsors and promoters of various enumerated spectator and participatory events.  In 1980, the ordinance was amended to shift the tax from the providers to their patrons.  Since then, the amusement tax ordinance has provided for a tax upon the patrons of amusements located within the City for the privilege of witnessing, viewing, or participating in such amusements.

¶ 8     The Chicago Municipal Code defines an amusement subject to the amusement tax to include three categories of activities:

> "(1) any exhibition, performance, presentation or show for entertainment purposes, including, but not limited to, any theatrical, dramatic, musical or spectacular performance, promotional show, motion picture show, flower, poultry or animal show, animal act, circus, rodeo, athletic contest, sport, game or similar exhibition such as boxing, wrestling, skating, dancing, swimming, racing, or riding on animals or vehicles, baseball, basketball, softball, football, tennis, golf, hockey, track and field games, bowling or billiard or pool games;

> (2) any entertainment or recreational activity offered for public participation or on a membership or other basis including, but not limited to, carnivals, amusement park rides and games, bowling, billiards and pool games, dancing, tennis, racquetball, swimming, weightlifting, bodybuilding or similar activities; or

> (3) any paid television programming, whether transmitted by wire, cable, fiber optics, laser, microwave, radio, satellite or similar means." Chicago Municipal Code § 4-156-010 (amended Nov. 21, 2017).

The Chicago Municipal Code exempts "automatic amusement devices" from the amusement tax and instead subjects their operators to a $150 tax per year per device. Chicago Municipal Code § 4-156-160 (amended Mar. 13, 2013). The Chicago Municipal Code defines an "automatic amusement device" as "any machine, which, upon *** any *** payment method, may be operated by the public generally for use as a game, entertainment or amusement *** and includes but is not limited to such devices as jukeboxes, marble machines, pinball machines, movie and video booths or stands and all [similar] games, operations or transactions[.]" Chicago Municipal

Code § 4-156-150 (amended Jul. 25, 2001).

¶ 9    The Chicago Municipal Code further exempts from the amusement tax "in person live theatrical, live musical or other live cultural performances that take place in any auditorium, theater or other space in the city whose maximum capacity, including all balconies and other sections, is not more than 1500 persons." Chicago Municipal Code § 4-156-010(D)(1) (amended Nov. 21, 2017).

¶ 10    On June 9, 2015, the City's department of finance issued Ruling 5, which defined the term "amusement" to include amusements that are delivered electronically to patrons in the City. According to the ruling, amusements delivered electronically include: the privilege of watching electronically delivered television shows, movies, or videos; the privilege of listening to electronically delivered music; and the privilege of participating in games, online or otherwise. The ruling made clear, however, that the amusement tax would not apply to rentals or temporary downloads. Ruling 5 also stated that providers who receive charges for electronically delivered amusements are considered owners or operators and therefore are required to collect the City's amusement tax from their customers. The ruling clarified that the amusement tax applies to any customer of an amusement delivered electronically whose residential street address or primary business street address is in Chicago, as reflected by his or her credit card billing address, zip code, or other reliable information as set forth in the MTSCA (35 ILCS 638/1 *et seq.* (West 2014)).

¶ 11    Thereafter, the city council, as part of the City's revenue ordinance for 2016, amended the Chicago Municipal Code as it relates to the amusement tax. That amendment provided:

"In the case of amusements that are delivered electronically to mobile devices, as in the case of video streaming, audio streaming and on-line games, the rules set forth in

the Illinois Mobile Telecommunications Sourcing Conformity Act, 35 ILCS 638, as

amended, may be utilized for the purpose of determining which customers and charges

are subject to the tax imposed by this chapter. If those rules indicate that the tax applies,

it shall be presumed that the tax does apply unless the contrary is established by books,

records or other documentary evidence." Chicago Municipal Code § 4-156-020(G1)

(amended Nov. 21, 2017).

¶ 12    Plaintiffs filed suit against defendants on September 9, 2015. The plaintiffs' operative

second amended complaint challenged the application of the amusement tax to streaming

services because: (1) streaming services are outside the scope of the City's amusement tax

ordinance; (2) the City taxes streaming services differently than it taxes equivalent in-person

amusements in violation of the Illinois Constitution's uniformity clause; (3) applying the tax to

streaming services imposes a discriminatory tax on electronic commerce in violation of the

ITFA; and (4) the City is taxing activity outside its borders in violation of the U.S. Constitution's

commerce clause. Plaintiffs requested a declaratory judgment and a permanent injunction.

¶ 13    After conducting discovery, plaintiffs and the City filed cross-motions for summary

judgment. When the matter was fully briefed and argued, the circuit court accepted the City's

arguments that the amusement tax on amusements delivered electronically did not violate the

state or federal constitution. The circuit court further found that Ruling 5 was not an

unauthorized expansion of the City's home rule authority nor did it violate the ITFA. The circuit

court thus granted summary judgment in favor of the City and denied plaintiffs' motion for

summary judgment. This appeal followed.

¶ 14                              ANALYSIS

¶ 15    On appeal, plaintiffs set forth three arguments regarding the facial constitutionality of the

6

City's application of its amusement tax on streaming services. First, plaintiffs contend that the streaming services tax exceeds the City's home rule authority because the tax effectively taxes activities that occur outside Chicago. Second, plaintiffs maintain that the tax on streaming services violates the uniformity clause of the Illinois Constitution of 1970. Third, plaintiffs assert the tax discriminates against electronic commerce in violation of the federal ITFA. Plaintiffs maintain that because the City's tax on streaming services exceeds its constitutional and statutory authority this court should reverse the circuit court's order denying plaintiffs' motion for summary judgment and granting defendants' motion for summary judgment. For the reasons that follow, we affirm.

¶ 16                                    Standard of Review

¶ 17    A circuit court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The circuit court must view these documents and exhibits in the light most favorable to the nonmoving party. *Midwest Gaming & Entertainment, LLC v. County of Cook*, 2015 IL App (1st) 142786, ¶ 46. When all parties file cross-motions for summary judgment, the court is invited to decide the issues presented as a question of law. *Mr. B's, Inc. v. City of Chicago*, 302 Ill. App. 3d 930, 933 (1998). Accordingly, our review is *de novo*. *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 69 (2008).

¶ 18    Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. *Stasko v. City of Chicago*, 2013 IL App (1st) 120265, ¶ 31. Mere speculation, conjecture, or guess, however, is insufficient to withstand summary

7

judgment. *Id.* The party moving for summary judgment bears the initial burden of proof. *Illinois Coin Machine Operators Ass'n v. County of Cook*, 2015 IL App (1st) 150547, ¶ 31. The purpose of summary judgment is not to try an issue of fact but to determine whether a triable issue of fact exists. *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 27.

¶ 19 Whether a municipal code provision or ordinance violates the constitution is a question of law that we review *de novo*, applying the same rules of construction as would govern the construction of statutes. *LMP Services, Inc. v. City of Chicago*, 2019 IL 123123, ¶ 15. Like statutes, municipal code provisions are presumed constitutional, and the burden of rebutting that presumption rests with the challenging party, who must demonstrate a clear constitutional violation. *Id.* A reviewing court must affirm the constitutionality of a statute or ordinance if it is "reasonably capable of such a determination" and resolve any doubt as to the statute's construction in favor of its validity. *Id.* (quoting *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20).

¶ 20                                        Facial Challenge

¶ 21 At the outset, we note that plaintiffs' action against the City is framed solely as a facial challenge to the constitutional validity of the amusement tax ordinance. Plaintiffs do not challenge the validity of the amusement tax ordinance as applied specifically to them. When examining a facial challenge, a court considers whether the statute or ordinance at issue contains "an inescapable flaw that renders the *** statute unconstitutional under every circumstance." *One 1998 GMC*, 2011 IL 110236, ¶ 58. A facial challenge is the most difficult challenge to mount successfully. *Id.* ¶ 20. This is because a legislative enactment is invalid on its face only if there are no set of circumstances under which it would be valid. *Id.* ¶ 20; see also *In re M.T.*, 221 Ill. 2d 517, 536 (2006) ("Successfully making a facial challenge to a statute's

constitutionality is extremely difficult, requiring a showing that the statute would be invalid under *any* imaginable set of circumstances." (Emphasis in original.)). Since a successful facial challenge will void the statute for all parties in all contexts, "facial invalidation is, manifestly, strong medicine that has been employed by the court sparingly and only as a last resort." (Internal quotation marks omitted.) *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009) (quoting *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). So long as there exists a situation in which a statute could be validly applied, a facial challenge must fail. *In re M.T.*, 221 Ill. 2d at 537. With these principles in mind, we now turn to consider plaintiffs' facial challenges to the ordinance.

¶ 22                              Home Rule Authority

¶ 23    Plaintiffs first maintain that subsection (G1) of the ordinance and Ruling 5 extend the reach of the amusement tax ordinance beyond Chicago's borders in violation of the home rule provision of the Illinois Constitution.

¶ 24    Article VII, section 6(a), of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(a)) allows home rule units, of which Chicago is undoubtedly one, to exercise "any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Home rule units may exercise concurrently with the State "any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i). In addition, the City has statutory authority to tax amusements. 65 ILCS 5/11-42-5 (West 2016); *City of Chicago v. StubHub!, Inc.*, 2011 IL 111127, ¶ 26.

Plaintiffs do not dispute that streaming services are amusements which are subject to tax, instead they maintain that the tax has an extraterritorial effect and thus exceeds the City's home rule authority.

¶ 25    In *City of Carbondale v. Van Natta*, 61 Ill. 2d 483, 485-86 (1975), our supreme court observed that "an examination of the proceedings of the [1970 Illinois Constitutional] convention shows that the intention [of the legislature] was not to confer extraterritorial sovereign or governmental powers directly on home-rule units.  The intendment shown is that whatever extraterritorial governmental powers home-rule units may exercise were to be granted by the legislature."  Accordingly, it is now axiomatic that home rule units like defendant have no jurisdiction beyond their corporate limits except what is expressly granted by the legislature. *Village of Chatham v. County of Sangamon*, 351 Ill. App. 3d 889, 893 (2004); *Harris Bank of Roselle v. Village of Mettawa*, 243 Ill. App. 3d 103, 114 (1993); *Village of Lisle v. Action Outdoor Advertising Co.,* 188 Ill. App. 3d 751, 760 (1989).  Thus, we must determine whether the City's streaming tax ordinance has an extraterritorial effect and, if so, whether that extraterritorial influence is expressly authorized by the legislature.

¶ 26    Plaintiffs assert that the City applies the amusement tax on streaming services to any customer who provides a Chicago billing address regardless of whether that customer actually uses those services in Chicago and therefore the tax has an unconstitutional extraterritorial effect. In support of their position, plaintiffs rely primarily on *Hertz Corporation v. City of Chicago*, 2017 IL 119945.  In that case, the city of Chicago imposed a tax on the use of personal property within its borders, including personal property that was rented or leased outside of the City.  *Id.* ¶ 1.  The City's comptroller issued Ruling 11, which provided guidance to suburban vehicle rental agencies located within three miles of Chicago's borders who were directed to pay the tax.

Ruling 11 stated that in the event of an audit, the City department of revenue would hold the suburban rental agencies responsible for paying the tax unless there was written proof that the lessee was exempt from paying the tax based upon the use of the leased vehicle outside of the City. *Id.* In the absence of such proof, Ruling 11 provided that the department of revenue would assume that a customer who is a Chicago resident would use the leased vehicle primarily in the City and that a customer who is not a Chicago resident would use that vehicle primarily outside of Chicago. *Id.* Plaintiffs Hertz Corporation and Enterprise Leasing Company of Chicago filed separate suits against the City and the City comptroller, seeking a declaration that the tax violated the Illinois and United States Constitutions and requested an injunction to prevent the City from enforcing the ordinance as to them. *Id.* ¶ 2. The circuit court declared Ruling 11 was facially unconstitutional and permanently enjoined the City from enforcing the ordinance against plaintiffs with respect to short-term vehicle rental transactions occurring outside the City's borders. *Id.* The appellate court reversed. *Id.*

¶ 27 Before our supreme court, the plaintiffs argued that Ruling 11 was unconstitutional because it extended the reach of the tax ordinance beyond Chicago's borders in violation of the home rule provision of the Illinois Constitution. *Id.* ¶ 13. Our supreme court agreed. The court explained that the City sought to tax the use of rental vehicles in Chicago, but instead, the tax was imposed on the stated intent as to future use or on a conclusive presumption of use based on Chicago residency, absent a statement of intent. *Id.* ¶ 30. Neither of these situations involved actual use of the rental vehicle within the City, thus, "[a]bsent an actual connection to Chicago, the City's tax under Ruling 11 amounts to a tax on transactions that take place wholly outside Chicago's borders." *Id.*

¶ 28 Here, plaintiffs maintain that *Hertz* dictates the result of this case, as both cases involve

11

an unconstitutional extraterritorial application of a tax. According to plaintiffs, like the lease tax in *Hertz*, the streaming services tax is not based on actual use within the City's borders but on the "conclusive presumption of taxability based on residency" – or in this case, a Chicago billing address.

¶ 29   While we agree with plaintiffs that *Hertz* is instructive, the case at bar is distinguishable from *Hertz* because it does not involve a "conclusive presumption of use based on Chicago residency." *Hertz*, 2017 IL 119945, ¶ 30. Where the ruling at issue in *Hertz* involved a conclusive presumption that a customer who is a Chicago resident would use the leased vehicle primarily in the City, the amusement tax ordinance, in contrast, sets forth a *rebuttable* presumption of residency. As stated in subsection (G), "It shall be presumed that all amusements are subject to tax under this article *until the contrary is established by books, records or other documentary evidence*." (Emphasis added.) Chicago Municipal Code § 4-156-020(G) (amended Nov. 21, 2017). Subsection (G1) similarly provides that, in the case of amusements that are delivered electronically to mobile devices, if the rules as set forth in the MTSCA indicate the tax applies, "it shall be presumed that the tax does apply *unless the contrary is established by books, records, or other documentary evidence*." (Emphasis added.) Chicago Municipal Code § 4-156-020(G1) (amended Nov. 21, 2017). Thus, there is no conclusive presumption of taxability based on residence as was the case in *Hertz*.

¶ 30   *Hertz* is further distinguishable because it involved an express provision within the comptroller's ruling which provided that suburban rental agencies within three miles of the borders of Chicago would be responsible for paying the tax unless there was written proof that the lessee was exempt from paying the tax based upon the use of the leased vehicle outside the City. *Hertz*, 2017 IL 119945, ¶ 1. What rendered this ruling an extraterritorial application of the

12

City's home rule authority was that it, in fact, taxed prospective use, not actual use, of the rented vehicle within Chicago. Absent actual use, the ruling had an extraterritorial effect rendering it unconstitutional.

¶ 31    In contrast, the ruling at issue here does not have such an extraterritorial effect. The amusement tax ordinance taxes only those patrons who view or participate in an amusement within Chicago. Chicago Municipal Code § 4-156-020(A) (amended Nov. 21, 2017). Ruling 5 and subsection (G1) clarify that when dealing with electronically delivered amusements, who will be taxed may be determined as provided in the MTSCA. The purpose of the MTSCA is to establish rules for state and local taxation of mobile telecommunication services and provides that such taxes shall be collected and remitted to the jurisdiction where the customer's primary use of the services occurs. 35 ILCS 638/5 (West 2016). The MTSCA defines "place of primary use" to mean "the street address representative of where the customer's use of the mobile telecommunications service primarily occurs, which must be: (i) the residential street address or the primary business street address of the customer; and (ii) within the licensed service area of the home service provider." 35 ILCS 638/10 (West 2016). If either address is located in Chicago then the streaming tax will be collected from that patron. If either of these addresses is not in Chicago, then the streaming services tax will not be collected from that patron. Thus, the streaming tax does not apply extraterritorially.

¶ 32    Plaintiffs, however, focus on the language of Ruling 5 which allows the comptroller to use a patron's billing address as a means of determining residency. Plaintiffs assert that using this method to determine who must pay the streaming tax is "fatally flawed" because it will "inevitably impose the tax on people whose use of streaming services occurs entirely outside Chicago, whom the City has no authority to tax."

13

¶ 33    "While administrative rules interpreting an act or ordinance are given substantial deference as an informed source of guidance as to legislative intent they are not binding on the court in its determination of validity of the ruling except to the extent that they follow the statute." *National Pride of Chicago, Inc. v. City of Chicago*, 206 Ill. App. 3d 1090, 1101 (1990). "Administrative rulings can neither limit, enlarge nor amend the scope of the statute beyond the clear import of the legislative language used, [citations] and courts are not bound by them except to the extent that they fall within the parameters of the statute or ordinance which the ruling purports to interpret." *Id.* Moreover, these rules and regulations are to be reasonable. Chicago Municipal Code § 2-32-096 (eff. Nov. 16, 2011).

¶ 34    Ruling 5 instructs that the department of finance will utilize the rules set forth in the MTSCA to determine the sourcing for the streaming tax. As an illustration, Ruling 5 states that "In general, this means that the amusement tax will apply to customers whose residential address or primary business street address is in Chicago, as reflected by their credit card billing address, zip code or other reliable information." The reference in Ruling 5 that it is appropriate to utilize a customer's billing address to determine residency is unreasonable. There is no mention of one's credit card billing address as being a proper means of determining a customer's place of primary use in the MTSCA. See 35 ILCS 638/10 (West 2016). While there are certainly instances where a customer's residential address is the same as his or her billing address that is not always the case. Indeed, a billing address is merely the address where a customer wishes his or her bill to be forwarded. It is evident that the legislature recognized this fact when it excluded billing address from the definition of "place of primary use." See *id.* Accordingly, the portion of Ruling 5 which provides that a credit card billing address can serve as a means of determining the sourcing for the amusement tax does not accurately reflect the language or intent of the

14

MTSCA. Here, it cannot be said that the comptroller's inclusion of "billing address" in Ruling 5 was a reasonable interpretation of the MTSCA. See Chicago Municipal Code § 2-32-096 (amended Nov. 16, 2011) ("The comptroller is authorized to make and enforce such reasonable rules and regulations as may be necessary to effectively administer any of the powers granted the comptroller in this code.").

¶ 35 We further observe that at the time Ruling 5 was issued there was no express language in the amusement tax ordinance referring to electronically delivered amusements. In addressing the applicability of the amusement tax to electronically delivered amusements, Ruling 5 stated the department of finance would employ the definition of "primary place of use" as set forth in the MTSCA. As discussed, Ruling 5 expanded this definition to include a patron's billing address. Subsequently, the amusement tax ordinance was amended to include a provision regarding the taxation of electronic amusements that are delivered to mobile devices. Chicago Municipal Code § 4-156-020(G1) (amended Nov. 21, 2017). The ordinance relies on the MTSCA's definition of "primary place of use" and does not refer to a patron's billing address as being indicative of one's primary place of use. See *id.*

¶ 36 Viewed in its entirety, the amusement tax ordinance does not express any intention to tax electronically delivered amusements based on a customer's billing address. Instead, it has the objective of taxing only those customers who engage in amusements in Chicago. In the case of electronically delivered amusements, which are indisputably amusements but differ from fixed-venue amusements, the city council evidenced its intent to tax said amusements based on the patron's primary place of use as defined by the MTSCA. The MTSCA does not provide that such a determination may be made based on a patron's billing address. We therefore find that Ruling 5 is inconsistent with the city council's intent insofar as it allows a patron's primary place

of use to be based on a billing address. Plaintiffs raise no argument that the City exceeds its home rule authority when it taxes a patron based on their residential address or primary business address. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)). Accordingly, we conclude that the amusement tax ordinance does not have an extraterritorial effect so as to render it unconstitutional.

¶ 37                                            Uniformity Clause

¶ 38     Plaintiffs maintain the amusement tax on streaming services violates the uniformity clause of the Illinois Constitution because the tax is applied differently to: (1) residents and nonresidents of Chicago; (2) "automatic amusement devices" (devices that provide video, music, and gaming entertainment, such as video machines, juke boxes, and pinball machines) and similar streaming services; and (3) live cultural performances and similar streaming services.

¶ 39     Article IX, section 2, of the Illinois Constitution provides:

> "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.

The standards for evaluating a challenge to a statute based on the uniformity clause are well established: To survive scrutiny under the uniformity clause, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed, and (2) bear some reasonable relationship to the object of the legislation or to public policy. *Marks v. Vanderventer*, 2015 IL 116226, ¶ 19 (quoting *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 153 (2003)).

¶ 40     The uniformity clause was intended to be a broader limitation on legislative power to

16

classify for nonproperty tax purposes than the limitation of the equal protection clause (*Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 469 (1987)) and was meant to insure that taxpayers would receive added protection in the state constitution based upon a standard of reasonableness that is more rigorous than that contained in the federal constitution (*Milwaukee Safeguard Ins. Co. v. Selcke*, 179 Ill. 2d 94, 102 (1997)). The party attacking a tax classification is not required to negate every conceivable basis that might support it. *Wirtz v. Quinn*, 2011 IL 111903, ¶ 83. When faced with a good-faith uniformity challenge, the taxing body bears the initial burden of producing a justification for the classification. *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248-49 (1992). The challenging party then has the burden of persuading the court that the taxing body's explanation is insufficient as a matter of law or unsupported by the facts. *Id.*

¶ 41 We first address plaintiffs' argument that the streaming tax violates the uniformity clause because it is applied differently to residents and nonresidents of Chicago. The City imposes the streaming tax on "customers whose residential street address or primary business street is in Chicago" (Ruling 5) but not on all customers who have the privilege of witnessing, viewing, or participating in amusements that are delivered electronically in Chicago. Plaintiffs contend that because the streaming tax is imposed on some patrons but not on others who participate in the exact same activity, it does not satisfy the "real and substantial" difference requirement.

¶ 42 The City maintains that there is a real and substantial difference between residents and nonresidents due to the inherent nature of streaming products lacking a physical situs. The City asserts that the situs of where a patron is electronically delivered an amusement is not fixed as it is in typical amusements, therefore, the City must presume that the patron's residential address or business address is the primary place where streaming occurs. In contrast, nonresidents do not

17

typically have Chicago addresses, nor do they tend to pay subscription fees primarily for the privilege of streaming in Chicago. According to the City, allowing tax collectors to rely on a patron's residence to collect the tax is a simple method to identify a large number of customers who stream in Chicago, and from whom the tax may be collected with little risk that the tax will be applied in another jurisdiction. The City further asserts that streaming Chicago residents receive greater benefits from the City than do nonresidents, such as street maintenance, repairs, and emergency services.

¶ 43    We conclude that plaintiffs have failed to meet their burden to persuade this court that the City's justification is insufficient, either as a matter of law or as unsupported by the facts. See *Empress Casino Joliet Corp.*, 231 Ill. 2d at 72. Judicial review of a legislative classification under a rational basis analysis is limited and deferential. The scope of a court's inquiry in a challenge to legislation under the uniformity clause remains relatively narrow as statutes carry the presumption of validity, and broad latitude is granted to legislative classifications for taxing purposes. *Allegro Services*, 172 Ill. 2d at 250; *Geja's Cafe*, 153 Ill. 2d at 248. If the plaintiff cannot persuade the court that the justification is insufficient, then, as a matter of law, judgment is proper for the taxing body. *Empress Casino Joliet Corp.*, 231 Ill. 2d at 72. Here, there is a real and substantial difference between residents and nonresidents of Chicago; those who reside in Chicago have residential or primary business addresses that are in Chicago, nonresidents do not. The City then uses these addresses to determine the patron's primary place of use of the streaming services. As stated in Ruling 5, the department of finance is not seeking to collect taxes from the use of streaming services outside of the City's jurisdiction. This classification bears a reasonable relationship to the object of the amusement tax, which is to generate revenue for the City. The City's argument that it is administratively convenient to collect the streaming

18

tax based on a patron's residential or primary business address is logical in this regard. When the City taxes a patron's use of streaming services that occurs primarily outside the City that patron is entitled to a refund of those taxes. See Chicago Municipal Code § 4-156-030(D) (amended Nov. 16, 2016); Chicago Municipal Code § 4-156-020(G1) (amended Nov. 21, 2017). Thus, taxing a nonresident would not generate revenue for the benefit of the City.

¶ 44    Plaintiffs further assert that the streaming tax violates the uniformity clause because it subjects streaming services to greater taxation than automatic amusement devices that deliver the same types of entertainment where streaming services serve an identical function.

¶ 45    The Code defines "automatic amusement device" as "any machine, which *** may be operated by the public generally for use as a game, entertainment or amusement, *** and includes but is not limited to such devices as jukeboxes, marble machines, pinball machines, movie and video booths or stands and all games, operations or transactions similar thereto under whatever name by which they may be indicated." Chicago Municipal Code § 4-156-150 (amended Jul. 25, 2001). Under the Code, automatic amusement devices operated for profit are taxed differently than other amusements; they are subject to a flat tax of $150 per year per device to be paid by the owner of the device. Chicago Municipal Code § 4-156-160 (amended Mar. 13, 2013 Chicago Municipal Code § 4-156-170 (amended Jun. 30, 2009).

¶ 46    Plaintiffs maintain that there are no real and substantial differences between the customers of streaming services and automatic amusement devices so as to allow them to be taxed differently. According to plaintiffs, both streaming services and automatic amusement devices provide on-demand video, music, or gaming entertainment. As an example, plaintiffs point to Spotify, an internet music service, which allows customers to access recorded music from a library of music for a fee "just as a jukebox does." Plaintiffs further observe that Netflix

19

allows one to watch videos "just as a video booth does."

¶ 47    The City disagrees and argues there are real and substantial differences between streaming services and automatic amusement devices.  The City observes that unlike streaming, automatic amusement devices are machines available for use by the public generally.  These machines are owned by businesses, such as bars and arcades, and are used on site by customers during business hours.  The amusements available on automatic amusement devices are limited in duration and in the number of available entertainment options.  Streaming, on the other hand, does not involve using a machine owned by another, and is usually enjoyed privately for an unlimited amount of time and at any time of the day.  The City further points out that streaming providers offer a wide variety of entertainment selections.

¶ 48    Plaintiffs support their argument that the distinction between customers of streaming services and automatic amusement devices is arbitrary by relying on *National Pride*.  In that case, the plaintiff brought suit for declaratory relief and an injunction against the city of Chicago contending that the Chicago Transaction Tax should not apply to self-service car wash facilities such as those operated by the plaintiff.  *National Pride*, 206 Ill. App. 3d at 1091.  Pertinent to this appeal, the plaintiff maintained that the transaction tax on its self-service car wash facilities violated the uniformity clause of the Illinois Constitution because it treated the plaintiff's car wash business differently than competitor car wash facilities.  *Id.*

¶ 49    In considering whether the tax violated the uniformity clause, the court first explained that there are three general types of car washes in the Chicago metropolitan area; coin-operated self-service car washes, automatic car washes, and tunnel car washes.  *Id.* at 1093.  The customer of an automatic car wash inserts money into a meter or pays an attendant to activate machinery.  He then drives his car into a stall where it remains stationary while car-washing machinery

20

moves around the car. The customer who has remained in the car then drives the car out of the stall and dries his own car. *Id.* The tunnel car wash involves a customer who pays the cashier a fee and his car is connected to equipment that pulls it through a tunnel-shaped facility where it is washed by machines. *Id.* The self-service car wash customer drives his car into a bay, inserts coins into a meter which activates washing equipment for a pre-determined period of time. The customer directs a high pressure water spray from a wand secured to a hose which is connected by piping running to a pump, electrical system, hot water supply, soap dispensers and other installations in an equipment room. The customer does not handle the equipment in the equipment room but merely handles the wand and directs the water spray which washes the car. *Id.* The court noted that, of the three, only the self-service customer provided hands-on control of the wand which directs the water to the vehicle while the other methods of car wash systems functioned with automatic machines and did not require customer participation except to drive the automobile to a place in close proximity to the automatic machines. *Id.* at 1093-94.

¶ 50     The court then explained the nature of the city of Chicago's Transaction Tax Ordinance, which taxed the lease or rental of any personal property that fell within one of eight general categories including (1) motor and other vehicles, (2) construction and demolition equipment, (3) road construction and maintenance, (4) household and office equipment, (5) clothing, (6) office and computing equipment, (7) such miscellaneous equipment such as musical instruments, and (8) leased time on equipment not otherwise itself rented. *Id.* at 1094-95. The City's department of revenue then issued Ruling 8, which extended the activities which are subject to the transaction tax to include the use of "car washing" machines where the possession does not transfer but where a charge is made for the period of use of the machine by the user. *Id.* at 1097. Ruling 8, however, excluded from the tax " 'automatic car washing machines operated and

21

controlled by the owner or manager of such machines, and where the customers only drive their automobiles into and out of such machines.' " *Id.*

¶ 51 The court concluded that Ruling 8 violated the uniformity clause of the Illinois Constitution because it created an unreasonable and arbitrary classification in assessing the tax against the plaintiff. *Id.* at 1103. The *National Pride* court determined that there was no real and substantial difference between a self-service car wash and an automatic or tunnel car wash where each of these facilities involved the exclusive use of the equipment for a fixed period of time and for a fixed period of money. *Id.* at 1104. The court explained that Ruling 8 created an "artificial distinction between plaintiff and its competitors based solely on the customer's hands-on participation in plaintiff's wash process" and therefore the Department of Revenue's interpretation of the ordinance was an improper exercise of its authority. *Id.*

¶ 52 Unlike the car washes in *National Pride*, there is a real and substantial difference between streaming services and automatic amusement devices. Streaming services are primarily used privately in the home or on devices owned and maintained by the patron. In contrast, automatic amusement devices are used publicly, outside the home and are owned and maintained by businesses. This classification bears a reasonable relationship to the object of the legislation, which is to generate revenue for the City. The amusement tax ordinance taxes automatic amusement devices differently due to their public nature. Instead of taxing each individual patron based on his or her de minimis use of the automatic amusement device, the machine is taxed on a yearly basis. The administrative convenience this tax system achieves is a rational basis for the classification. See *DeWoskin v. Loew's Chicago Cinema, Inc.*, 306 Ill. App. 3d 504, 521 (1999) ("The expenses incurred in the collection of a tax as compared to the revenue to be derived provides a rational basis for the granting of an exemption.").

¶ 53    Lastly, plaintiffs assert that the streaming services tax violates the uniformity clause because it taxes certain performances delivered through streaming services at a higher rate than it taxes in-person live cultural performances.

¶ 54    The amusement tax ordinance exempts from the amusement tax "admission fees to witness in person live theatrical, live musical, or other live cultural performances that take place in any auditorium, theater or other live cultural space in the City whose maximum capacity, including all balconies and other sections is not more than 1500 persons."  Chicago Municipal Code § 4-156-020(D)(1) (amended Nov. 21, 2017).

¶ 55    Plaintiffs maintain that difference between live theatrical, musical, or cultural performances and streaming services providing similar or identical performances is arbitrary because the only distinction is between a patron viewing it in person or over the internet.  The City disagrees, and maintains that live performances encourage patrons to visit Chicago and go into public spaces where they can view not only the live cultural performance but also frequent other Chicago businesses like restaurants, bars, stores, and hotels.

¶ 56    We observe that plaintiffs' brief violates Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018)) for failing to support their arguments on this issue with authority.  The argument section of an appellant's brief must contain the appellant's contentions and reasons therefor, with proper authorities cited.  *Grundhoefer v. Sorin*, 2014 IL App (1st) 131276, ¶ 19. "Arguments that do not comply with Rule 341(h)(7) do not merit consideration on appeal and may be rejected by this court for that reason alone." *Wells Fargo Bank, N.A. v. Sanders*, 2015 IL App (1st) 141272, ¶ 43.  Accordingly, plaintiffs forfeit review of this issue.  *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12.

¶ 57    In sum, we conclude that the amusement tax ordinance, as it relates to streaming services,

does not violate the uniformity clause.

¶ 58                                    Internet Tax Freedom Act

¶ 59    Plaintiffs finally maintain that the streaming tax violates section 1101(a)(2) of the ITFA (47 U.S.C. § 151 note) because it prohibits the City from imposing taxes at a different rate on services provided over the internet, such as streaming service, than on transactions involving similar services provided through other means.  Plaintiffs assert this discrimination occurs in two ways.  First, the ordinance requires customers of streaming services to pay the amusement tax, even though the ordinance entirely exempts users of automatic amusement devices from taxation.  Second, the ordinance fully or partially exempts live theatrical, musical, and cultural performances at theaters and other venues from the amusement tax but taxes streaming services that provide access to similar or identical theatrical, musical, or cultural performances over the internet.

¶ 60    The City disagrees, arguing that streaming products like Netflix, Spotify, and Hulu are not taxed any differently than similar amusements and therefore plaintiffs' argument under the ITFA fares no better than their uniformity clause argument.  According to the City, as previously discussed, the differences between amusements and streaming products are real and substantial, therefore they are not "similar" for the purposes of the ITFA.  The City further observes that other amusements that bear more obvious similarities to streaming (like cable television and movies) are taxed in the same manner.  For the reasons that follow, we agree with the City.

¶ 61    Section 1101(a)(2) of the ITFA prohibits a state from imposing "discriminatory taxes on electronic commerce."  47 U.S.C. § 151 note.  Section 1105(2)(A)(ii) defines a discriminatory tax, in pertinent part, as "any tax imposed by a State or political subdivision thereof on electronic commerce that *** is not generally imposed and legally collectible at the same rate by such State

or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means." 47 U.S.C. § 151 note. "Electronic commerce" is defined in section 1105(3) as "any transaction conducted over the Internet *** comprising the sale *** of property, goods, [or] services." 47 U.S.C. § 151 note. Thus, under the ITFA, a discriminatory tax exists only when similar property, goods, services, or information are taxed when purchased electronically but not when purchased offline, or when the tax on electronic purchases is imposed at a different rate or on different persons. See 47 U.S.C. § 151 note.

¶ 62    Only one case in Illinois has involved consideration of section 1101(a)(2) of the ITFA and a similar allegedly discriminatory tax, *Performance Marketing Association, Inc. v Hamer*, 2013 IL 114496.[1]  *Performance Marketing* involved a use tax on a particular type of contractual relationship known as "performance marketing." *Id.* ¶ 8.  As explained by our supreme court, "performance marketing" refers to marketing or advertising programs in which a person or organization that publishes or displays an advertisement (often referred to as an "affiliate" or "publisher") is paid by the retailer when a specific action, such as a sale, is completed. *Id.*  In performance marketing, the retailer tracks the success or "performance" of the marketing campaign, and sets the affiliate's compensation accordingly. *Id.*  Such contractual arrangements are not limited to the Internet but are also used in print and broadcast media, where promotional codes are used to generate and track sales. *Id.*

¶ 63    At issue in the case was the Illinois General Assembly's enactment of Public Act 96-1544 (Act), which required "out-of-state internet retailers and servicemen to collect state use tax if they had a performance marketing contract with a person in Illinois who displayed a link on his

---

[1] We acknowledge that the Seventh Circuit considered section 1101(a)(2) in *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363 (7th Cir. 2010).  That case, however, involved a different type of discriminatory tax than is at issue in this case. *Id.* at 366 (considering section 1105(2)(B)(ii) of the ITFA *not* section 1105(2)(A)(ii)).

or her website that connected an internet user to that remote retailer or serviceman's website."
*Id.* ¶ 7. In contrast, performance marketing by an out-of-state retailer which appeared in print or on over-the-air broadcasting in Illinois did not trigger the Illinois use tax collection obligation. *Id.* ¶ 17.

¶ 64   Our supreme court determined that the Act was preempted by section 1101(a)(2) of the ITFA because it imposed a discriminatory tax on electronic commerce. *Id.* The court explained that under the Act, performance marketing over the Internet provided the basis for imposing a use tax collection obligation on an out-of-state retailer when a threshold of $10,000 in sales through the clickable link was reached. *Id.* Performance marketing by an out-of-state retailer which appears in print or on over-the-air broadcasting in Illinois, and which reaches the same dollar threshold, however, does not trigger an Illinois use tax collection obligation. *Id.* The court concluded that "by singling out retailers with Internet performance marketing arrangements for use tax collection, the Act imposes discriminatory taxes within the meaning of the ITFA." *Id.* ¶ 19.

¶ 65   Plaintiffs assert that the same outcome achieved in *Performance Marketing* is warranted in this case because the streaming services tax imposes an unlawful discriminatory tax on electronic commerce by taxing streaming services but not similar amusements that take place in Chicago. The outcome of *Performance Marketing*, however, is not determinative of the outcome here as the case at bar bears no factual resemblance to *Performance Marketing*. The services at issue in *Performance Marketing* were identical, the only difference was that those services which were provided over the internet were taxed and those that were in print or over-the-air broadcasting were not. *Id.* ¶ 23. In the context of this case, plaintiffs' arguments under the ITFA are essentially the same as their arguments under the uniformity clause. Indeed, plaintiffs' ITFA

argument references and relies upon those same arguments. Moreover, similar to their uniformity clause argument, plaintiffs continued in their failure to cite to any authority that live cultural performances are similar to streaming services in their ITFA argument. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Had we agreed with plaintiffs and come to the conclusion that streaming services were the same as automatic amusement devices and live cultural performances, a discussion of the potential discrimination against electronic commerce under section 1105(2)(A)(ii) would be warranted. We, however, came to the opposite conclusion. Accordingly, we conclude that the ITFA does not operate to invalidate the amusement tax on streaming services.

¶ 66                                    CONCLUSION

¶ 67      For the reasons stated above, we affirm the judgment of the circuit court.

¶ 68      Affirmed.

**No. 1-18-1379**

| | |
|---|---|
| **Cite as:** | *Labell v. The City of Chicago*, 2019 IL App (1st) 181379 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CH-13399; the Hon. Carl Anthony Walker, Judge, presiding. |
| **Attorneys for Appellant:** | Jeffrey M. Schwab and James J. McQuaid, of Liberty Justice Center, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Edward N. Siskel, Corporation Counsel of the City of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, of counsel), for appellee. |